# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| H.E., | No. CV-26-01770-PHX-DJH (JFM) |
| Petitioner, | **ORDER** |
| v. | |
| Pamela Bondi,[1] et al., | |
| Respondents. | |

On March 16, 2026, Petitioner, through counsel, filed a habeas corpus petition under 28 U.S.C. § 2241 challenging his immigration detention.  (Doc. 1).  By Order dated March 17, 2026, the Court ordered Respondents to show cause for why the Petition should not be granted.  (Doc. 5).  After the parties responded (Docs. 9, 10), the Court ordered additional briefing on whether Petitioner's continued detention is permitted by *Zadvydas v. Davis*, 533 U.S. 678 (2001).  (Doc. 12).  That additional briefing has now been provided.  (Docs. 13, 14, 16).  For the reasons that follow, the Court will grant the Petition and order that Petitioner be immediately released from custody.

## I.     Background

Petitioner is a native of Iran who fled that country due to his sexual orientation. Petitioner entered the United States in January 2025 and was taken into custody.  On April 30, 2025, an immigration judge (IJ) ordered him removed from the United States to Iran;

---

[1] Department of Homeland Security (DHS) Secretary Markwayne Mullin is substituted as Respondent for former DHS Secretary Kristi Noem.  Fed. R. Civ. P. 25(d).

this order was amended on May 1, 2025 to include Turkey as an alternate country for removal. Petitioner was not aware of this amended ruling and did not receive records of the proceedings until February 2026—by which time the IJ's removal order(s) had already become final. In November 2025, through new counsel, Petitioner filed a Motion with the Board of Immigration Appeals (BIA) seeking to accept his untimely appeal of the IJ's removal order. When the BIA denied that motion on December 19, 2025, Petitioner appealed that denial to the Tenth Circuit Court of Appeals. That appeal remains pending, and the Tenth Circuit has issued a stay of removal while it considers Petitioner's appeal.

As of the date of this Order, Petitioner remains detained by ICE.

## II.    Legal Standard

As the Court concluded in its prior Order (Doc 12), Petitioner's continued detention is governed by 8 U.S.C. § 1231 and *Zadvydas*.[2] Under § 1231(a)(1), the Government has 90 days in which to remove an alien once a removal order becomes final. Detention during this removal period is mandatory. 8 U.S.C. § 1231(a)(2). If the Government is unable to effect removal within the 90-day removal period, however, continued detention of aliens such as Petitioner becomes discretionary. 8 U.S.C. § 1231(a)(6). That discretion, however, is not unfettered, and indefinite detention is not permitted. *Zadvydas*, 533 U.S. at 689 (8 U.S.C. § 1231(a)(6) "does not permit indefinite detention."). This is not to say that every alien like Petitioner must be released once the 90-day removal period has expired. 533 U.S. at 701. Rather, the Supreme Court in *Zadvydas* recognized an implicit post-§ 1231(a)(2) period in which continued detention is "presumptively reasonable" and does not violate the Fifth Amendment. *Id.* The *Zadvydas* Court concluded that this

---

[2] To the extent Respondents suggest that Petitioner has waived any claim pursuant to *Zadvydas* (*see* Doc. 13 at 8 n.4), the Court's rejects this argument. As discussed in the Court's March 30, 2026 Order, Petitioner's sole claim for relief is that he is detained in "violation of the Fifth Amendment right to procedural due process." (Doc. 12 at 2-3). The parties initially disagreed on the statutory basis for Petitioner's continued detention, with the Court ultimately concluding that continued detention was pursuant to § 1231(a)(6). (Doc. 12 at 2). However, this conclusion "only alter[ed] the analysis of [Petitioner's] underlying due process claim, not the claim itself." (*Id.* at 3). Petitioner's due process claim—as analyzed under *Zadvydas*—is therefore not waived, and Respondents' concern about any "new information" presented by Petitioner has been ameliorated by the opportunity to file a further sur-response. (Docs. 15, 16).

"presumptively reasonable" period extends for no more than 6-months once an order of removal becomes final (including the 90-day mandatory detention period under § 1231(a)(2)). *Id.* Thereafter, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* If, after considering the evidence, the Court finds that "removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699.

**III.   Discussion**

**A.     Removal Period**

Despite previously arguing that Petitioner "is detained under Section 1231(a)(6)" (*see* Doc. 9 at 2, 3), Respondents now assert that "Petitioner is not detained under Section 1231(a)(6) at all—he is detained instead under Section 1231(a)(2)(A)." (Doc. 13 a 7). To reach that conclusion, Respondents argue that Petitioner obstructed his removal, causing the 90-day mandatory detention period to be extended pursuant to § 1231(a)(1)(C).

The § 1231(a)(1) removal period begins "on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement."

(8 U.S.C. § 1231(a)(1)(B)). However, "[t]he removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien . . . conspires or acts to prevent the alien's removal subject to an order of removal." (8 U.S.C. § 1231(a)(1)(C)).

Here, although Petitioner currently has an appeal pending with the Tenth Circuit, and it has issued a stay of removal, that appeal is not of "the removal order," as the Court discussed in its prior Order. (*See* Doc. 12 at 2). Section 1231(a)(1)(B)(ii) thus cannot apply. Similarly, § 1231(a)(1)(B)(iii) also cannot apply because Petitioner has been detained "under an immigration process" since January 2025. The only remaining

possibility is § 1231(a)(1)(B)(i).  As discussed in the Court's prior Order, the IJ's removal order became administratively final when no timely appeal was filed.  (*See* Doc. 12 at 2).  As such, the § 1231(a)(1) 90-day removal period began to run on June 2, 2025, the date on which the IJ's removal order became administratively final, pursuant to § 1231(a)(1)(B)(i).

Respondents argue that the removal period has been extended under § 1231(a)(1)(C) because "Petitioner repeatedly obstructed ICE's lawful removal efforts."  (Doc. 13 at 3).  Respondents identify two instances of alleged obstruction: First, "Petitioner obstructed his removal on November 3, 2025."  (*Id.* at 6).  Second, on or about December 11, 2025, Petitioner was scheduled for a removal flight, but "his 'attorney advocated for [him] and told them [i.e. ICE] that [he] had a motion to the Board of Immigration Appeals pending and they did not put [him] on a flight.'"  (*Id.*) (brackets in original).[3]

### 1.  Petitioner's Obstruction?

First, the Court notes that neither of these instances occurred during the § 1231(a)(1) removal period, but instead occurred after that period had already expired.  As a matter of statutory construction, it is not clear how a period that has already "expired" could somehow be "extended," and none of the authority provided by Respondents sheds light on this question.  *See Lema v. I.N.S.*, 341 F.3d 853 (9th Cir. 2003) (finding that § 1231(a)(1)(C) extended removal period when alien took actions that began during the removal period to frustrate efforts to obtain travel documents); *Pelich v. I.N.S.*, 329 F.3d 1057 (9th Cir. 2003) (same).

Even assuming that post-§1231(a)(1) conduct can "reset" the § 1231(a)(1) removal period, Respondents have failed to demonstrate that Petitioner "conspire[d] or act[ed] to prevent [his] removal subject to an order of removal" within the meaning of § 1231(a)(1)(C).  As to evidence supporting the first instance—the flight on November 3, 2025—Respondents cite to Petitioner's Declaration, where Petitioner does indeed avow that he "refused to cooperate with the ICE officers" when "they tried to put [him] on a

---

[3] As discussed, *infra*, Respondents have now disclaimed that any obstruction occurred in December 2025 that would trigger § 1231(a)(1)(C).  (Doc. 16 at 1).

flight to Iran." (Doc. 1-1 at 9). However, Petitioner further avows that this non-cooperation consisted of "cr[ying] and begg[ing]," and telling the officers that he was "not safe and cannot go back" and "they will execute [him]." (*Id.*). Petitioner does not avow—and Respondents do not allege—that he physically resisted the officers in any way or otherwise did anything more than "cr[y] and beg[]." For their part, Respondents indicate only that the November 3, 2025 flight was "cancelled due to transportation not arriving at the airport on time." (Doc. 13-1 ¶ 19). Respondents do not allege—and no evidence has been provided to support—that transportation did not arrive at the airport on time *due to any action of Petitioner*. Nor have they explained how "cr[ying] and begg[ing]" somehow prevented ICE officers from "put[ting] him on a flight." Presumably, Petitioner is not the first alien to "cr[y] and beg[]" at the moment of removal, and it seems that if that is all it takes to "obstruct ICE's lawful removal efforts," very few removals would occur indeed.

In any event, the Court concludes that "cr[ying] and "begg[ing]" do not rise to the level of "conspire[ing]or act[ing] to prevent the alien's removal" contemplated by § 1231(a)(1)(C). *See e.g. Seretse-Khama v. Ashcroft*, 215 F.Supp.2d 37, 51 (D.D.C. 2002) (statement by alien that he did not want to return to his native country does not, without more, amount to failure to cooperate under § 1231(a)(1)(C)). None of the cases cited by Respondents persuade the Court otherwise. In *Diouf v. Mukasey*, 542 F.3d 1222 (9th Cir. 2008), a Senegalese alien was ordered removed but granted voluntary removal within a certain time and released from custody to do so. 542 F.3d at 1225. When he failed to voluntarily depart, ICE issued a Notice to Appear directing him to present himself to immigration authorities by a certain date for removal. *Id.* at 1225-1226. The alien failed to present himself, and evaded authorities for more than 18 months before he was finally apprehended. *Id.* at 1226. After apprehending him, ICE "made arrangements for Diouf to depart for Senegal," but Diouf "refused to leave." (*Id.*) The Ninth Circuit concluded that "by frustrating ICE's efforts to effect removal in this manner, Diouf conspired or acted to prevent his removal and thereby extended his removal period" pursuant to § 1231(a)(1)(C). *Id.* at 1230. Here, Petitioner has not evaded apprehension (he has been in custody since

the day he entered the United States), and while it is unclear how the alien in *Diouf* "refused to leave" after being apprehended, even assuming *arguendo* that it included nothing more than, as here, "cr[ying] and begg[ing]," that refusal was merely the crescendo to nearly two years of open defiance. *Diouf* is not analogous to the facts here. The remaining authority cited by Respondents—*Lema* and *Pelich* (*see* Doc. 13 at 4)—relate to an alien's failure or refusal to assist with obtaining travel documents, which is not at issue here. The Court thus concludes that Petitioner's actions on November 3, 2025 did not operate to extend or "reset" the § 1231(a)(1) removal period.

### 2. Alleged Petitioner's Attorney Comments/Conduct

As to the second instance, Respondents indicate that Petitioner was scheduled for a removal flight departing December 11, 2025, but prior to that date Petitioner's counsel intervened and "told them [i.e., ICE] that [he] had a motion to the Board of Immigration Appeals pending." (Doc. 13 at 6) (brackets in original). Petitioner was then removed from the flight manifest. (Doc. 13-1 ¶ 22).

In their initial Supplemental Response, Respondents asserted that "[a]lthough it is unknowable exactly what Petitioner's attorney said, it seems likely . . . that [s]he represented to ICE that Petitioner was not presently removable due to his pending motion before the Board of Immigration Appeals, and such statement would have been untrue." (Doc. 13 at 6). Respondents further argue that "[s]uch a statement would also constitute the sort of 'intentionally obstructionist, bad faith tactic[] that [is] designed to frustrate the government's attempts to effectuate a removal order' that triggers § 1231(a)(1)(C)." (*Id.* at 6-7). In his Supplemental Response, Petitioner's counsel provides evidence that she did no such thing (*see* Doc. 14 at 3; Doc. 14-1), and Respondents now concede that without "specific records of what Petitioner's attorney did or did not state," they cannot argue that any "obstruction took place in December that would re-trigger 8 U.S.C. § 1231(a)(1)(C)." (Doc. 16 at 1).

Although Respondents have now disclaimed this second instance of alleged obstruction (*see* Doc. 16 at 1), the Court is compelled to comment on counsel's accusation

in Respondents' initial Supplemental Response that Petitioner's counsel "likely . . . represented to ICE that Petitioner was not presently removable due to his pending motion before the Board of Immigration Appeals, and such statement would have been untrue," and that "[s]uch a statement would also constitute the sort of 'intentionally obstructionist, bad faith tactic[] that [is] designed to frustrate the government's attempts to effectuate a removal order' that triggers § 1231(a)(1)(C)."  (Doc. 13 at 6-7).  Rule 11(b)(3) of the Federal Rules of Civil Procedure provides that:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney…certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation and discovery.

Despite recognizing at the time that "it is unknowable exactly what Petitioner's attorney said" (Doc. 13 at 6)—and now conceding that "Respondents do not have specific records of what Petitioner's attorney did or did not state" (Doc. 16 at 1)—counsel for the government nevertheless represented that, as a matter of fact, it was "likely" that Petitioner's counsel made an intentional misrepresentation—a lie—to federal authorities, possibly to the point of criminality.  *See* 18 U.S.C. § 1001.  While the timeline of litigation in this action has been compressed, that does not absolve counsel of their duty to make "an inquiry reasonable under the circumstances" and that, by presenting a filing to the Court, they are certifying, to the best of their knowledge, information, and belief, that "the factual contentions have evidentiary support" or "will have evidentiary support" upon further investigation and discovery.  Fed. R. Civ. P. 11(b)(3).  It does not appear that counsel for the government made the reasonable inquiry required by Rule 11, or, most importantly, that his accusation had any evidentiary support.  It is difficult to imagine how the accusation could have evidentiary support when counsel himself acknowledged it was "unknowable" what, if anything, Petitioner's counsel said.

Indeed, what evidence has been provided either does not support, or cuts directly against, counsel's accusation.  In the initial Supplemental Response, counsel for the

- 7 -

government points to the Petition, and to the Declaration included with Respondents' Supplemental Response, as support for his accusation. (Docs. 13, 13-1). In the cited portion of the Petition—page 8 at ¶ 27—Petitioner states,

> On November 24, 2025, through new pro bono counsel, [Petitioner] filed a motion to accept an untimely appeal due to ineffective assistance of counsel and the IJ's legal errors. On December 19, 2025, the Board denied [Petitioner's] motion to accept a late-filed appeal. [Petitioner] timely filed a petition for review of that decision, which remains pending in the Tenth Circuit.

In the cited portion of the Declaration—page 3 ¶ 21—ICE Deportation Officer (DO) Carlos Haro[4] avows,

> On December 2, 2025, BIA stated that they would proceed with adjudication of stay. On the same day BIA stated that they denied the stay.

Nothing in either of these passages supports the contentions made by counsel for the government. Neither makes any mention of any communication between counsel and "ICE," and, indeed, have no obvious evidentiary relevance to counsel's accusation.

For her part, counsel for Petitioner avows that on December 2, 2025, she emailed the ICE El Paso Field Office. (Doc. Doc. 14-1 at 2). That email states, in its entirety, "I want to make sure you all see that there is now an appeal pending before the BIA for [Petitioner]. He has been informed that he is on the list for the next deport flight to Iran this week." (Doc. 14-1 at 8). Nothing in that email makes any representation about Petitioner's removability, let alone anything that could be construed as an intentional *misrepresentation* that "Petitioner was not presently removable." Counsel for Petitioner

---

[4] It does not appear—contrary to the Court's directive in its March 30, 2026 Order—that DO Haro has personal knowledge about the facts asserted in the Declaration. (*See* Doc. 12 at 5) ("Any response or reply must be supported by documentary evidence including, if applicable, affidavits by individuals with personal knowledge of the factual statements made therein and signed under penalty of perjury."). Although DO Haro states that the Declaration is "based on [his] personal knowledge," given the often truncated sentence structure of the Declaration, it appears that it is largely—if not entirely—based on "information obtained from available records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business." (Doc. 13-1 ¶ 2). Thus, it appears that—at best—DO Haro has personal knowledge as to the contents of whatever "records, systems, databases, other DHS employees, and information portals" he reviewed, but is not qualified to attest that the events described therein actually occurred or are accurately reflected.

further avows that, to her knowledge and belief, "ICE has the internal capacity and responsibility to query whether a respondent has a stay of removal." (Doc. 14-1 at 2). This is consistent with the Court's understanding, and the suggestion that ICE officials would simply *take defense counsel's word* that Petitioner "was not presently removable" would be, in the Court's experience, beyond credulity. Nevertheless, this imagined credulity appears to be the basis for counsel's accusation. (*See* Doc. 13 at 6) ("it seems likely" that Petitioner's counsel misrepresented Petitioner's removability "because ICE removed [Petitioner] from his scheduled flight." (Doc. 13 at 6). This conclusion is further undercut by Respondents' own evidence, given that DO Haro avows that, to the extent a stay of removal was requested on December 2, 2025, the BIA "denied the stay." (Doc. 13-1 ¶21). No evidence has been provided to support that counsel for Petitioner misrepresented Petitioner's removability, much less that ICE somehow relied on such a misrepresentation.

Like Rule 11, the Arizona Rules of Professional Conduct also require that the claims and contentions made during litigation have a good faith, non-frivolous basis in law and fact. Ariz. Rules of Prof'l Conduct 3.1, 3.4. The Rules further require that where counsel has actual knowledge of an ethical violation, an ethical duty to report is triggered. Ariz. Rules of Prof'l Conduct 8.3, 8.4. The Court will separately consider whether sanctions pursuant to Rule 11(c) or disciplinary referral are warranted here.

In any event, having disclaimed that any action in December 2025 operated to extend the § 1231(a)(1) period, and the Court having found that Petitioner's actions during November 2025 did not trigger § 1231(a)(1)(C), the Court concludes that the § 1231(a)(1) period was not extended and therefore expired 90-days after the IJ's removal order became administratively final (*i.e.* approximately September 2, 2025). The "presumptively reasonable" *Zadvydas* period thus expired 90 days after that (*i.e.* approximately December 2, 2025). As such, Petitioner has now been detained for approximately four months beyond the *Zadvydas* period.

**B.    Likelihood of Removal**

Having determined that Petitioner is currently detained beyond the *Zadvydas* period,

the Court must determine whether Petitioner has shown "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," and, if so, whether the Government has provided evidence sufficient to rebut that showing. 533 U.S. at 701. If, after considering the evidence, the Court finds that "removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699.

Petitioner argues that his removal is not significantly likely in the reasonably foreseeable future due to the ongoing hostilities between the United States and Iran. (Doc. 14 at 3-5). Petitioner further provides evidence that ICE has represented in other recent actions that removals to Iran are not currently possible. (*Id.* at 4; Doc. 14-3). The Court agrees. Given the ongoing war between the United States and Iran, there is "good reason" to believe that Petitioner's removal is not significantly likely to occur in the reasonably foreseeable future. The burden thus shifts to Respondents to rebut this showing with sufficient evidence.

Respondents assert that "Petitioner's removal was imminent before the stay of removal was entered, as shown by ICE's readiness to put him on a flight not once, but twice," and that there is thus no barrier to his removal but for the Tenth Circuit's stay. (Doc. 13 at 3, 8). Even if the Tenth Circuit's stay were lifted, however, Respondents ignore that, while it may have been possible to remove Petitioner to Iran in prior months, that time has passed. The United States and Iran are now at war, and Respondents make no representation that they are now able to remove *anyone*—let alone Petitioner—to Iran. No evidence has been provided to support that there is any possibility of removal to Iran in the reasonably foreseeable future. (*See* Doc. 14-3).

Respondents further contend, however, that "the question is not whether [Petitioner's] removal is reasonably foreseeable *now*, it is whether it is reasonably foreseeable at such time as the Tenth Circuit denies his petition for review." (Doc. 16 at 2). This argument relies on two suppositions: First, the that the Tenth Circuit will resolve Petitioner's appeal in the government's favor; and second, that Iran will again accept

removals from the United States.  Respondents concede, however, that "[t]he situation in Iran is presently very unpredictable, and it is impossible to say whether the war will still be going on after the Tenth Circuit rules on Petitioner's petition for review."  (Doc. 16 at 2).  It is similarly "impossible" to foresee when the Tenth Circuit may rule on Petitioner's petition for review, or how it might rule.  As such, under these circumstances, Petitioner's continued detention is, by definition, indefinite.  *Zadvydas*, 533 U.S. at 689 (8 U.S.C. § 1231(a)(6) "does not permit indefinite detention.").

The only remaining possibility then is that Petitioner might be removed to Turkey—as provided in the IJ's amended removal order—or to a third country.  However, Respondents provide no evidence that they have made any efforts to effectuate Petitioner's removal to Turkey or any other country.  Respondents make no allegation, let alone provide evidence to support, that Turkey (or anywhere else) has agreed to accept Petitioner, or that they are attempting to obtain travel documents to Turkey (or anywhere else).

The Court thus concludes that, on the record presented, and notwithstanding the Tenth Circuit's ongoing stay of removal, there is no significant likelihood that Petitioner will be removed from the United States in the reasonably foreseeable future, and his continued detention thus violates the Fifth Amendment.[5]  Indeed, Respondents themselves concede that but for their arguments regarding timeliness—which the Court has rejected, *see* Part III.A, *supra*—Petitioner "likely ha[s] a very strong claim for release."  (Doc. 16 at 3).

. . . .

---

[5] For the same reasons, the Court reaches the same conclusion even if the § 1231(a)(1) period had been "reset" in November 2025 due to Petitioner's "obstruction," and his current detention was thus still within the presumptively reasonable *Zadvydas* period. *Sweid v. Cantu*, CV 25-03590-PHX-DWL (CDB) (D.Ariz. Oct. 30, 2025) ("Within the six-month window, the *detainee* must prove the unreasonableness of detention, and courts must accord great deference to Executive Branch determinations based on foreign policy expertise and administrative necessity.").  Even granting "great deference" to the Executive Branch, with all evidence supporting that it is currently impossible to remove Petitioner to Iran, and no evidence having been provided that any effort has been made to remove Petitioner to Turkey, the Court concludes that Petitioner has overcome the presumption that his continued detention is reasonable, and that Respondents have failed to rebut that showing.

- 11 -

Accordingly, the Court will grant the Petition, and order that Petitioner be immediately released from custody.

**IT IS THEREFORE ORDERED**:

(1)    The Clerk of Court is directed to **substitute** Department of Homeland Security (DHS) Secretary Markwayne Mullin as Respondent for former DHS Secretary Kristi Noem.

(2)    The Petition for Habeas Corpus (Doc. 1) is **granted**.

(3)    Respondents must **IMMEDIATELY RELEASE** Petitioner from custody.

(4)    Within **48 HOURS** of this Order, Respondents must file a Notice of Compliance.

(5)    The Clerk of Court must enter judgment accordingly and close this case.

Dated this 6th day of April, 2026.

Honorable Diane J. Humetewa
United States District Judge